*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1296**

State of Minnesota,
Respondent,

vs.

Chad Michael Smith,
Appellant.

**Filed July 14, 2014
Affirmed
Stauber, Judge**

Beltrami County District Court
File No. 04CR112339

Lori A. Swanson, Attorney General, St. Paul, Minnesota; and

Timothy R. Faver, Beltrami County Attorney, Wyatt T. Arneson, Assistant County Attorney, Bemidji, Minnesota (for respondent)

Charles A. Ramsay, Daniel J. Koewler, Ramsay Law Firm, P.L.L.C., Roseville, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Worke, Judge; and Stauber, Judge.

## UNPUBLISHED OPINION

**STAUBER**, Judge

On appeal from his conviction of driving while intoxicated (DWI) appellant argues that (1) the district court erred when it concluded that the stop of appellant's

vehicle was supported by an honest suspicion of criminal activity that was both reasonable and articulable and (2) appellant's consent to an alcohol-concentration test was coerced. We affirm.

**FACTS**

At 12:15 a.m. on June 19, 2011, Deputy Sheriff Robert Fraik was dispatched on a call regarding "a suspicious vehicle" observed by an anonymous informant. Deputy Fraik was aware that burglaries had recently taken place in the area. He encountered a vehicle, a pickup truck, at the location indicated by the informant, made a U-turn, and began following the pickup truck at close range. Deputy Fraik was close enough to be able to read the pickup truck's license-plate number.

After following the pickup truck for five or six miles, Deputy Fraik observed the vehicle's tires encroach onto the centerline of the road at least once, but possibly twice. He then initiated a traffic stop of the pickup truck because "[i]t was a suspicious vehicle, and for the center line infraction." Deputy Fraik was joined by Deputy Tim Bender in a separate squad car. Deputy Fraik made contact with the driver, who was identified as appellant Chad Smith. Deputy Fraik advised appellant that "he had been called in as a suspicious vehicle," and observed an odor of alcohol coming from the cab of the vehicle. Deputy Fraik asked appellant whether he had been drinking. Appellant initially denied drinking, but immediately thereafter admitted that "he had been consuming a little bit" of alcohol.

Deputy Fraik asked appellant to exit the vehicle to conduct field sobriety testing. While conducting the horizontal-gaze nystagmus test, Deputy Fraik smelled alcohol on

2

appellant. Deputy Fraik observed "six indicators of impairment out of the six that [he was] looking for."[1] He administered a walk-and-turn test and did not observe any signs of balance impairment. He asked appellant to take a preliminary breath test (PBT). Appellant deliberated for several minutes about whether to submit to the test because he was afraid he would not pass the test, and his job requires him to maintain a commercial driver's license. Deputy Fraik and Deputy Bender advised appellant that if he refused to take the PBT he would be arrested, but if he complied and the PBT indicated an alcohol concentration of less than .08 he would be free to go home. Appellant submitted to a PBT, and the result was .109.

Appellant was arrested and read the implied-consent advisory. Appellant indicated that he understood the advisory. Appellant was given an opportunity to call an attorney but did not do so. Deputy Fraik asked appellant to submit to a blood test, and appellant agreed. Appellant was taken to a hospital where his blood was drawn and sent to the BCA lab for testing. The blood test indicated an alcohol concentration of .10.

Appellant was charged with fourth-degree DWI under Minn. Stat. § 169A.20, subd. 1(5) (2010). Appellant moved to suppress the blood-test evidence, arguing inter alia that the vehicle stop was unlawful and that the taking of appellant's blood without a warrant was an unlawful search. Testimony and evidence were received at a contested omnibus hearing, including Deputy Fraik's testimony, appellant's testimony, and Deputy

_____

[1] Deputy Fraik testified that during a horizontal gaze nystagmus test he looks for "six indicators of impairment." Those include the "lack of smooth pursuit. . . . nystagmus prior to 45 degrees, and distinct and sustained nystagmus at maximum deviation." He further testified that nystagmus is the "involuntary movement of the eyes that can be caused by alcohol or other controlled substances."

3

Fraik's squad-car video. The district court denied appellant's suppression motion, concluding that the stop was supported by reasonable suspicion and that the evanescent nature of alcohol in the blood established exigent circumstances justifying the search and seizure of appellant's blood.[2] A stipulated-facts trial was held pursuant to Minn. R. Civ. P. 26.01 and *State v. Lothenbach*, 296 N.W.2d 854 (Minn. 1980). Appellant was found guilty and sentenced to 90 days in jail stayed for a period of two years. This appeal followed.

## D E C I S I O N

When reviewing a pre-trial order from a motion to suppress evidence, this court "may independently review the facts and determine, as a matter of law, whether the evidence need be suppressed." *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn. 1992). This court "review[s] the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quotation omitted).

## I. Reasonable suspicion

A police officer may not stop a vehicle without reasonable suspicion. *Marben v. State*, 294 N.W.2d 697, 699 (Minn. 1980). Reasonable suspicion may be supplied by information provided by another person. *Id.* But in this case, the anonymous informant did not provide any identifying information and there was no other indication that the

---

[2] The district court issued its decision prior to the issuance of the United States Supreme Court's decision in *Missouri v. McNeely*, 133 S. Ct. 1552, 1556 (2013), which held that the evanescent nature of alcohol in the blood does not create a per se exigent-circumstance exception to the warrant requirement.

informant was particularly reliable. *See Olson v. Comm'r of Pub. Safety*, 371 N.W.2d 552, 556 (Minn. 1985) (concluding police lacked reasonable suspicion based on an anonymous tip where nothing was known about the informant or about what the informant actually saw); *cf. State v. Pealer*, 488 N.W.2d 3, 5 (Minn. App. 1992) (distinguishing *Olson* on the basis that information was received from a known reliable informant). Nor did the informant provide any facts from which the police could corroborate the veracity of the tip other than that the vehicle was seen on a particular road. *See Florida v. J.L.*, 529 U.S. 266, 271, 120 S. Ct. 1375, 1379 (2000) (concluding that police lacked reasonable suspicion where tip "provided no predictive information" and was "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information"); *cf. Marben*, 294 N.W.2d at 699 (concluding that anonymous tip from a trucker established reasonable suspicion based upon "the trucker's reference to the location of [the officer's] squad car and the vehicle in question, the trooper was able to verify that the trucker was in the area, and in close proximity to the subject car"). Moreover, a mere allegation of "suspicious" behavior is not sufficient to justify an investigatory stop. *See Thompson v. Reuting*, 968 F.2d 756, 759-60 (8th Cir. 1992) (concluding that a tip regarding a suspicious vehicle parked in a high-crime area was not sufficient information to establish reasonable suspicion).

But Deputy Fraik had another basis to stop appellant: appellant's observed driving conduct. Deputy Fraik observed appellant's vehicle tires pass onto the centerline once, and possibly twice. "[T]he factual basis required to support a stop for a 'routine traffic

5

check' is minimal. . . . All that is required is that the stop be not the product of mere whim." *Marben*, 294 N.W.2d at 699 (quotation omitted). "Generally, if an officer observes a violation of a traffic law, no matter how insignificant the traffic law, that observation forms the requisite particularized and objective basis for conducting a traffic stop." *State v. Anderson*, 683 N.W.2d 818, 823 (Minn. 2004); *see also State v. Engholm*, 290 N.W.2d 780, 784 (Minn. 1980) (upholding stop where defendant was observed driving slowly and weaving within his lane); *State v. Barber*, 308 Minn. 204, 207, 241 N.W.2d 476, 477 (1976) (upholding traffic stop based on officer's observation that a vehicle's license plate was wired, not bolted on); *Gerding v. Comm'r of Pub. Safety*, 628 N.W.2d 197, 201 (Minn. App. 2001) (upholding investigative stop based on officer's observation of an object hanging from vehicle's rear-view mirror), *review denied* (Minn. Aug. 15, 2001).

In this case, Deputy Fraik testified that he observed appellant's vehicle encroach onto the centerline of the two-way highway at least once. Minn. Stat. § 169.18, subd. 7(a) (2010), provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Deputy Fraik testified that he investigates this type of traffic violation in order to prevent head-on vehicle crashes. Wandering across the centerline could also be an indication that the driver is intoxicated. *See Engholm*, 290 N.W.2d at 784 (holding that evidence of driver weaving within his lane supported an officer's reasonable suspicion that driver was intoxicated). A stop is lawful so long as there is at least one objective and valid ground supporting the stop.

*State v. Pleas*, 329 N.W.2d 329, 332 (Minn. 1983). Because Deputy Fraik observed appellant violate a traffic law, though slightly, he had reasonable articulable suspicion to stop appellant to investigate that violation.

Appellant argues that the police lacked reasonable suspicion for the stop because Deputy Fraik was tailgating appellant and that this conduct caused appellant to drive onto the centerline. Appellant relies on *Brechler v. State*, which held that the police lacked reasonable suspicion to stop a vehicle after seeing it swerve only once. 412 N.W.2d 367, 368-69 (Minn. App. 1987). But in *Brechler*, this court held that the stop resulted from the police officer's actions in tailgating the suspect vehicle, causing the vehicle to pull off the roadway. *Id.* at 369. In this case, Deputy Fraik observed a traffic violation while following appellant's vehicle closely, but not so closely that appellant was forced off the road. Unlike *Brechler*, the presence of police did not wrongly "precipitate[] the stop." *See id.*

Appellant also argues that he drove onto the centerline because the road was narrow and winding and he was driving an oversized truck, and because Deputy Fraik was following too closely and distracting him. Weaving within one's own lane on a windy night with low visibility does not give a police officer reasonable suspicion of criminal activity. *Warrick v. Comm'r of Pub. Safety*, 374 N.W.2d 585, 586 (Minn. App. 1985). But in this case, the record does not reflect that the visibility was diminished by poor weather, and it was not windy. Therefore, it was not error to conclude that the stop was supported by reasonable suspicion.

## II.      Voluntary consent

Appellant also argues that his consent to an alcohol-concentration test was constitutionally invalid because, under the totality of the circumstances, his consent was coerced.  The United States and Minnesota Constitutions protect citizens against unreasonable searches and seizures.  U.S. Const. amend. IV; Minn. Const. art. I, § 10.  Taking blood samples from a suspect constitutes a "search" under the Fourth Amendment.  *State v. Brooks*, 838 N.W.2d 563, 568 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014).  "But police do not need a warrant if the subject of the search consents." *Id.*  "Whether consent is voluntary is determined by examining 'the totality of the circumstances.'" *Id.* (quoting *State v. Harris*, 590 N.W.2d 90, 102 (Minn. 1999)).  The voluntariness of consent is a fact question that we ordinarily review for clear error, but in this case the district court did not analyze the validity of appellant's consent.  *See State v. Diede*, 795 N.W.2d 836, 846 (Minn. 2011).  We subject claims of voluntary consent to "careful appellant review."  *State v. George*, 557 N.W.2d 575, 580 (Minn. 1997).

Appellant argues that his consent to blood-alcohol testing was not voluntary because he was under arrest when he gave consent.  "Although a person who has been seized may still voluntarily consent, we infer consent less readily after a seizure because 'once arrested, a person becomes more susceptible to police duress and coercion.'" *Diede*, 795 N.W.2d at 847 (quoting *State v. High*, 287 Minn. 24, 27, 176 N.W.2d 637, 639 (1970)).  But the fact that appellant was arrested by itself does not render his consent involuntary.  *See Brooks*, 838 N.W.2d at 571.  This case is indistinguishable from *Brooks*, where the defendant was in custody but "was neither confronted with repeated police

8

questioning nor was he asked to consent after having spent days in custody." *Id.*
"[N]othing in the record suggests that [appellant] was coerced in the sense that his will had been overborne and his capacity for self-determination critically impaired." *Id.*
(quotation omitted); *cf. Diede*, 795 N.W.2d at 847-48 (suspect consented to search after being arrested, after being asked repeatedly by police to consent, after suspect expressly refused, and after police used a show of force). Because there is no indication that the police pressured appellant to urge him to consent to testing, the fact that appellant was arrested, without more, is insufficient to show that his consent was coerced.

Appellant also argues that his consent was coerced because he did not consult with an attorney prior to giving his consent. "[T]he ability to consult with counsel about an issue supports the conclusion that a defendant made a voluntary decision." *Brooks*, 838 N.W.2d at 572. Appellant was given the opportunity to call an attorney but did not do so. But, the fact that appellant did not consult an attorney is but one factor among many in the analysis. In *Brooks*, our supreme court concluded that consent to an alcohol-concentration test was voluntarily given where probable cause was established, the police followed appropriate procedures, the suspect was read the implied-consent advisory, the suspect was given access to a telephone and called his attorney, and there were no facts showing that his will was overborne. 838 N.W.2d at 569-70. In this case, the majority of these factors militate in favor of finding that appellant voluntarily consented.

Although *Brooks* concluded that the reading of the implied-consent advisory, which states that there is a right to refuse testing, was a factor in favor of finding voluntary consent, appellant argues that the advisory is coercive because it states that

9

refusal is a crime. But the advisory also states that a driver has a choice about whether to take the test. *Id.* at 572; *see also* Minn. Stat. § 169A.51, subd. 2 (2010) (listing requirements for the implied-consent advisory). Because we conclude that appellant's consent was voluntary under the totality-of-the-circumstances, we do not reach the state's alternative arguments in support of the admissibility of the blood-test evidence.

**Affirmed.**